UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CIVIL NO. 07-113-REW

MARY LYDIE CLAY, et al.                                                              PLAINTIFFS

VS:                                          OPINION & ORDER

K. PETROLEUM, INC.                                                                    DEFENDANT

\* \* \* \* \*

The Court considers a motion for summary judgment filed by Plaintiffs Mary Lydie Clay, et al. *See* DE #18; *see also* DE #21 (Response) & DE #22 (Reply). At issue in this case is an oil and gas lease pertaining to 1,334 acres in Clay County, Kentucky. Plaintiffs, the lessors, ask that the Court declare the lease terminated and award damages related to unpaid royalties or trespass. Defendant K Petroleum, Inc., (hereinafter "KP") is the lessee and argues that lease cancellation or forfeiture, and *a fortiori* a trespass award, would be improper under Kentucky law. Defendant also contests damages.

Based on a full review of the record and arguments, under applicable law, the Court GRANTS Plaintiffs' motion for summary judgment, in part. KP's unremedied failure to pay the required minimum royalty works a forfeiture on this record, and Plaintiffs are also entitled to damages.

**I.  Facts**

In May 1985, Plaintiffs (collectively referred to as the "Garrard Heirs" or "Heirs") leased an oil and gas interest in Clay County, Kentucky to Apple Oil and Gas Company. *See* DE #18-3.

The lease, under ¶¶ 3-4, entitles the lessors to receive, as a production royalty, 1/8 of all proceeds from the sale of gas produced under the lease. *See id*. In addition, the lease states:

> 17. Lessee will drill at least one well during each of the first and second lease years and such number of additional wells in subsequent lease years thereafter as the market for gas in that area will permit and as the production of gas from this tract will require.
>
> 18. Lessee will guarantee an annual minimum, nonrecoupable, royalty of $3,000.00 per year, payable annually in advance, on each anniversary of the closing of the transaction for the second and subsequent lease years; failing which the lease will terminate as to all but each producing well and 40 acres around it.

*See id*.

About ten years later, two of the lessors recorded an "Affidavit of Non-Payment of Rental" in the Clay County Clerk's office. *See* DE #18-4 (Affidavit Recorded 5/22/95). The lessee at that time was American Gas Corporation. The affidavit alleged:

> Affiants state that Affiants have not received any rental payments or any other income from any preceding oil and gas leases beyond their primary term, and that all preceding oil and gas leases are null and void due to non-payment of rentals and/or have expired under their own terms.
>
> Affiants further state that, while oil and gas continues to be produced from the subject property, no rental payments have been paid to Affiants or any other oil and gas owner since February, 1994, and that under the terms of said lease dated May 30, 1985, the lease has expired and/or been broken by the Lessor's assignee for non-payment of royalty.

*See id*.

In July 1995, nearly two months after filing of the affidavit, American Gas assigned the lease to Defendant K Petroleum. *See* DE #18-5. Counsel for the Heirs wrote KP's president, Jam Khorrami, in August. The communication advised Khorrami that the "lease had been terminated for non-payment of royalty," but invited KP to "negotiate a new lease." *See* DE #18-6 (Letter Dated

8/25/95). The correspondence indicated that David Scott, a geologist hired by the Heirs, had full negotiation authority. *See id*.

Khorrami responded within a week. He made no reference to a new lease agreement, but his letter stated that he had "spoken" to Scott and understood that Scott would monitor KP's operations and royalty disbursements, apparently in accordance with the original lease. *See* DE #18-6 (Letter Dated 8/29/95). Khorrami also advised that American Gas had agreed to release royalty funds held in escrow since February 1994. Khorrami pledged that KP would distribute the funds upon receipt. In addition, the communication explained that the lessors should expect production royalties on or before the first of each month. *See id*.

The Heirs, by counsel, replied at the end of September 1995. The communication stated:

> It is our position that the terms of the lease were violated by your predecessors-in-title during 1994 and 1995 by taking gas off the property and not paying royalties therefor. We filed a valid notice of termination of the lease in the Clay County Clerk's office in May, 1995, prior to your purchase from American Gas. I believe that your company had constructive and actual notice of the termination of the lease.

*See* DE #18-6 (Letter Dated 9/29/95). Counsel also requested production records to verify the calculation of the escrowed royalty payments. The communication ended: "Once we have this information in hand, we may be in a position to sit down and discuss this matter with you[.]" *See id*.

KP evidently furnished the requested documentation in October 1995. *See* DE #18-7 (Letter Dated 11/20/96). The record shows no further dispute among the parties about unpaid royalties until November 2006.[1] At that time, the Heirs notified K Petroleum via current counsel that no

---

[1] Between October 1995 and November 2006, that the parties never executed a new lease. However, some of the lessors executed division orders in 2000 and 2006. *See* DE #21-2 – #21-5.

"minimum royalties" had been paid.[2]  *See* DE #18-9 (Letter Dated 11/28/06).  As such, the communication asserted that the lease "has terminated except for the remaining producing gas well on the premises," per ¶ 18.  *See id*.  Notably, the November 2006 correspondence, unlike the 1995 communications, did not contend that the lease was invalid before its assignment to KP.

K Petroleum responded in February 2007, stating:

> KPI agrees to pay . . . the difference of the prepaid contract amount and the actual amount paid on the royalties of oil and gas.  We will extend this credit to the year 2002.  We will also agree to either send a pre-paid royalty amount of 3,000 dollars at the anniversary of the lease or just pay the actual royalties and calculate the difference at the end of each lease period.

*See* DE #18-11 (Email Dated 2/13/07).[3]  Mr. Khorrami, at deposition, further explained Defendant's interpretation of ¶ 18 and the $3,000 minimum royalty requirement:

> Q: . . . [I]t's K Petroleum's position that the annual minimum of $3,000 does not have to be paid in addition to production royalties.
>
> A: Absolutely not.
>
> Q: Sir?
>
> A: Absolutely not.  We do not have to pay another $3,000 on top of what the wells produce.

---

The orders, which are essentially identical, primarily address the distribution of gas production revenues.  *See* DE #18-13.  The documents implicitly and explicitly recognize that the underlying oil and gas lease remained valid.  *See id*. ¶ 4("Owner hereby confirms, ratifies, and warrants the oil, gas, and mineral lease or leases covering the tract or tracts as to which Owner(s) is credited with an interest, and recognizes the respective lease or leases to be presently valid and subsisting in accordance with its or their terms[.]"); *see also id*. ¶1.

[2]

The notice reflected that KP had paid production royalties, although it alleged that Defendant was improperly deducting undefined expenses and property taxes.  *See* DE #18-9.

[3]

Both parties freely reference correspondence involving, arguably, settlement discussions.  The Court thus considers them despite Fed. R. Evid. 408.

> Q: And you can't point to any language in this lease where it says that you can offset production royalties against the nonrecoupable royalties –
>
> A: Look at the intent of the parties. This has gone on for 17 years.
>
> Q: Okay.
>
> A: And nobody has asked for it.
>
> \* \* \*
>
> Q: . . . And what is the term "nonrecoupable" mean to you?
>
> A: That means that we cannot recover that money in terms of, we cannot call it advanced royalties.
>
> Q: Alright. In other words, you can't recover that payment from production royalties?
>
> A: Of course we can't. That's what, that's what there . . . It's a $3,000 minimum nonrecoupable production royalty. That means that we have to give [the Heirs] $3,000 regardless of the production numbers. If the well did only $1 then we have to give them $3,000 a year.
>
> Q: Alright. Is it your position that if the well did $1, you would only offset that $1 against the $3,000?
>
> A: Exactly.

*See* DE #26 at 47-48 (Khorrami Dep.).

Following KP's limited offer to pay the "difference" between the $3,000 minimum and the "actual amount paid," Plaintiffs' counsel replied that the Heirs probably would not accept the proposed cure. *See* DE #18-11 (Email Dated 2/13/07). Because the minimum royalty is "nonrecoupable," the Heirs contend that KP owes $3,000 annually in addition to royalties for gas production. According to counsel's reply, KP also should pay interest on the delinquent minimum royalties, and counsel further indicated that the Heirs would require "an aggressive drilling program" if KP "desired to retain the lease." *See id.*

5

Plaintiffs' counsel contacted Khorrami again, explaining that he had authorization to file suit to terminate the lease and to collect the delinquent minimum royalties. *See* DE #18-12 (Letter Dated 3/13/07). The communication stated, however, that the Heirs would "entertain any good faith proposal of settlement," but that any settlement would have to include a provision canceling the lease, except as to any producing wells. *See id.* According to Plaintiffs, KP made no offer.

In March 2007, Plaintiffs filed suit in Clay Circuit Court. *See* DE #1-2. KP properly removed the case to federal court. *See* DE #1-1. Based on the May 1995 affidavit recorded in the Clay County Clerk's office, the Heirs argue that they properly terminated the lease **before** its assignment to KP. However, the Plaintiffs acknowledge that American Gas would have maintained continuing rights to any producing wells and the surrounding forty acres, per lease ¶ 18. The Heirs explain that American Gas validly assigned these limited interests to KP, but insist that Defendant "had no other rights under the Lease."[4] *See* DE #18-2 at 12 (hereinafter "Supporting Memo"). Plaintiffs allege trespass because KP allegedly "claimed to enjoy all of the benefits of the Lease" and "attempt[ed] to possess the entire Lease premises." *See id.* at 12, 19. According to Plaintiffs, the applicable measure of damages for trespass "is the reasonable rental value of the land, which in this case would be the same as the nonrecoupable annual royalty." *See id.* at 19.

Alternatively, if the lease was never terminated and American Gas properly assigned a full interest to KP, the Heirs contend that KP subsequently violated the lease by not drilling additional

---

[4] K Petroleum provides no specific legal argument regarding the validity of the lease prior to its assignment, but the record fairly shows that KP claims an interest in the full 1,334 acres. *See* DE #6-2 (Khorrami Affidavit); *see also* Supporting Memo at 4 n.1; DE #26 Khorrami Dep. at 87-88.

wells, per ¶ 17, and by failing to pay the nonrecoupable annual minimum royalties.[5] *See id.* at 16-17.

Based on these defaults, the Heirs request that the Court declare the lease terminated and award unpaid royalties plus interest. Furthermore, per Plaintiffs, the minimum royalty would establish the reasonable rental value for trespass purposes, meaning that the amount of damages under either theory would be the same. *See id.* at 18-19.

## II. Standard of Review

This matter invokes the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. A federal court sitting in diversity applies the substantive law, including the choice of law rules, of the forum state. *See Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001). Whether jurisdiction is based on a federal question or diversity, the Federal Rules of Civil Procedure apply. *See Hayes*, 266 F.3d at 566.

Per Rule 56, summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S.Ct. 1348, 1356 (1986); *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 497 (6th Cir. 2007).

---

[5] KP denies that it owes a $3,000 minimum royalty plus production royalties. Because the Heirs have accepted production royalties without objection, and based on the division orders executed in 2000 and 2006, KP also asserts that the Heirs have waived any potential breach. *See* DE #21.

The burden of establishing the absence of a genuine issue of material fact is on the moving party initially. *See Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2553 (1986). Once the moving party discharges its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *See id.*; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *See Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986).

**III. Analysis**

*Trespass*

The Court rejects Plaintiffs' trespass theory. According to the Heirs, the May 1995 affidavit properly canceled the lease before its assignment to KP. In the absence of any previous notice, however, the affidavit would have been legally insufficient to forfeit the lease. The state courts explain:

> In Kentucky, there are three distinct grounds pursuant to which an oil and gas lessee may lose his interest in a lease. The first ground is forfeiture. With respect to an oil and gas lease, the ground of forfeiture is the breach of an express or implied covenant, condition or obligation of the lease. The second ground is abandonment, which is the intentional and actual relinquishment of the leased premises. The third and final ground occurs when the lease is terminated by its own terms.

*Hiroc Programs, Inc. v. Robertson*, 40 S.W.3d 373, 377 (Ky. Ct. App. 2000)(citations and quotations omitted). Both parties cite as applicable the first *Hiroc Programs* standard.

Plainly, the May 1995 affidavit sought forfeiture because the lessee allegedly violated the agreement by failing to pay royalties. However, before a lessor may thereby effect a lease forfeiture, the lessor must "provide notice and demand due diligence." *See Hiroc*, 40 S.W.3d at 377; *see also Carrs Fork Corp. v. Kodak Mining Co.*, 809 S.W.2d 699, 702 (Ky. 1991)("The law does not favor

forfeiture and none should be allowed without the one claiming the right first giving notice that a forfeiture will be demanded unless the terms of the lease are followed."). The record in this case does not establish whether the lessors provided notice to American Gas before recording the affidavit. As such, the affidavit, as the initial notice, could not have itself legally terminated the lease.[6]

Furthermore, even if the Heirs actually canceled the lease, Plaintiffs acknowledge that KP still would have received an interest in the producing wells and the surrounding forty acres, per ¶ 18. *See* Supporting Memo at 12. The Plaintiffs assert trespass because Defendant allegedly "claimed to enjoy all of the benefits of the Lease" and "attempt[ed] to possess the entire Lease premises."[7] *See id.* at 12, 19. Plaintiffs, however, provide no authority establishing trespass merely because KP ostensibly asserted an interest in 100% of the property. Instead, a subsurface trespass generally requires some action on the land, such as actual drilling or mining. *See, e.g., Cont'l Res., Inc. v. Farrar Oil Co.*, 559 N.W.2d 841, 844 (N.D. 1997). Here, Plaintiffs expressly allege that "*KP has done nothing* with the leasehold since it accepted the assignment." *See* Supporting Memo at 15

---

[6]

The affidavit may have been notice that the Heirs would demand forfeiture unless the lessee satisfied the contract terms, but it appears that KP cured the breach by distributing production royalties that had been escrowed by American Gas. *See Bridges v. Jeffrey*, 437 S.W.2d 732, 733 (Ky. 1968)(holding lessee had "cured" breach when lessor accepted past due rental payments). Once KP distributed the escrowed funds and provided the corresponding production documents, the record reflects no further dispute about the production royalties or the validity of the lease. In fact, the subsequent division orders expressly recognize that the underlying lease was valid.

The Court also has questions about the effect of the notice for other reasons. First, the notice did not issue from all lessors. Second, the notice did not mention the minimum royalty obligation. Third, the notice inaccurately identified the lease itself. These reasons, at least at the summary judgment stage, would additionally undercut the effectiveness of any purported termination in 1995.

[7]

The record, in fact, indicates that KP claims an interest in the full 1,334 acres. *See* DE #6-2; DE #26 Khorrami Dep. at 87-88.

(emphasis added). As a legal matter, if KP retained a right to continue operation of the producing wells, and if KP has taken no additional steps on the property, KP has not trespassed.

*Alleged Breaches by KP*

Failure to drill

Alternatively, if the lease was fully effective upon assignment, Plaintiffs argue that KP subsequently violated the lease by not drilling additional wells and by failing to pay the $3,000 minimum royalty. Based on these violations, the Heirs argue that the Court should declare the lease terminated and award damages.

With respect to drilling additional wells, the lease specifically states:

> 17. Lessee will drill at least one well during each of the first and second lease years and such number of additional wells in subsequent lease years thereafter as the market for gas in that area will permit and as the production of gas from this tract will require.

*See* DE #18-3. The Heirs summarily assert that "market conditions are highly favorable," but provide no actual evidence. *See* Supporting Memo at 15. Khorrami, on the other hand, explains that "[a]ny decision as to drilling new wells . . . is driven by market forces," and he claims that the market would not justify "spending more drilling dollars." *See* DE #6-2; DE #26 Khorrami Dep. at 65-68. The Heirs' conclusory argument, backed by no supporting record facts, fails to even carry the movant's initial burden under Rule 56.

Annual minimum, nonrecoupable royalty

The minimum royalty argument is an entirely different matter. The Heirs contend that KP has failed to pay required minimum royalties, per ¶ 18. The provision states:

> 18. Lessee will guarantee an annual minimum, nonrecoupable, royalty of $3,000.00 per year, payable annually in advance, on each anniversary of the closing of the transaction for the second and subsequent lease years; failing

10

>    which the lease will terminate as to all but each producing well and 40 acres
>    around it.

*See* DE #18-3.

KP has admitted its failure to abide by this paragraph. Mr. Khorrami testified as such, agreeing that KP had not paid the full $3,000.00 per annum. *See* DE #26 Khorrami Dep. at 56-57 ("That's true."); (agreeing that KP has not paid "the difference between the royalties and the 3,000"). In written discovery, KP stated, "Defendant has not paid to the Lessors annual minimum nonrecoupable royalties[.]"). *See* DE #26–14 (Response to Request for Admission No. 1). While KP offers defenses to be discussed, the basic issue of noncompliance is clear.

The interpretation of a contract generally is a question of law. *See 3D Enters. Contracting Corp. v. Louisville and Jefferson County Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005). The "primary objective" is to ascertain and "effectuate the intention of the parties." *See id.* Absent an ambiguity, the Court should not consider "extrinsic evidence," but should "look only as far as the four corners of the document to determine the parties' intentions." *See id.*; *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000). The contract "must be construed as a whole, giving effect to all parts and every word in it if possible," and the Court should "assign[] language its ordinary meaning." *See City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986); *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). A contract is ambiguous if it is capable of multiple, reasonable interpretations. *See Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981).

The contract in this case provides that failure to pay the minimum royalty results in lease termination – "failing which the lease will terminate as to all but each producing well and 40 acres around it." *See* DE #18-3 ¶ 18. KP has failed to make the payment, despite the Heirs' express demand, and absent a successful countervailing theory, termination follows.

11

KP presents two general arguments in avoidance: waiver, and the execution of division orders. The Court rejects both, as a matter of law.

KP's waiver theory rests on the Heirs' continued receipt of production royalties since the assignment to KP. Thus, the argument goes, the Heirs cannot take those production royalties over a course of time and still claim breach of the minimum royalty obligation. KP cites various waiver and estoppel cases to support the argument.

In many lease contexts, KP's waiver theory might have merit. It cites to the circumstance of, *e.g.*, a failure to object to lease assignment as waived by later acceptance of rent. KP also discusses laches principles that could, for equitable reasons particular to a case, prevent a lessor from asserting tardy objections to lessee noncompliance. *See P.V. & K Coal Co. v. Kelly*, 191 S.W.2d 231, 233-34 (Ky. 1945). Neither of those scenarios materially matches KP's situation.

As noted previously, KP has engaged in **no** additional development of the lease tract since it took the lease assignment. *See* DE #26 Khorrami Dep. at 58-59; *id*. at 64-65 (agreeing as "true" that KP has drilled no wells since assignment). The original six wells feed into one master meter, which has served as the basis for royalty calculation over the entire period. *See id*. at 60-61. Plainly, KP has not invested or made developmental steps in reliance on the validity of the lease as to the full leasehold since 1995, which would have bolstered the equity-based laches or waiver arguments. Further, given KP's continuing lease rights as to any producing wells (+ 40 acres), the parties stand in the exact position they would have occupied had the Heirs raised and pursued to conclusion the nonpayment issue back in 1995. Because the lease assures KP's continuing interest in producing wells, even post termination, the Heirs could quite properly receive production royalties from those wells and still use nonpayment of the minimum royalty as a basis for

cancellation as to the global leasehold. KP shows no prejudice from this course, and KP's predicament, if any, is the result of its own lease management decisions.

KP's division order argument similarly fails. The document plainly addresses the signatory's ownership interest, and is a tool for certifying proper revenue distribution relating to the lease. *See* DE #18-11 (E-mail from Mr. Khorrami stating, "The Division of Orders [sic] which have been executed by your client are to verify their SS# and their current addresses. The Division of Orders cannot and will not change the ownership of your clients' mineral interest."). KP suggests that the documents somehow waive previous breach arguments. The Court would have serious questions related to consideration, if the document purported to effect waiver, but in this case the division orders nowhere mention or reference the minimum royalty issue. Although the orders – which the Court assumes all lessors eventually signed – do concede lease effectiveness, that concession is not in conflict with the result in this case; the lease was in effect until terminated by the pre-action notice, the absence of cure, and the result of the litigation. The division orders do not, in any way, excuse KP from lease compliance or waive any prior noncompliance.

*Remedy*

KP's silence about the proper construction of ¶ 18 communicates much to the Court. The lessee admitted not paying the full $3,000.00, but Mr. Khorrami testified that the annual minimum should be reduced by production royalties actually paid. *See* DE #26 Khorrami Dep. at 47. KP does not repeat this argument in the briefing.

The Court sees no basis for permitting KP a credit against the annual obligation. Of course, the terms of the agreement control. KP obligated itself to an "annual minimum, nonrecoupable, royalty of $3,000.00 per year." *See* DE #18-3 ¶ 18. Under established Kentucky law, "No credit

against the minimum royalty may be made except as authorized by and in accordance with the lease." *See Elkhorn Coal Corp. v. By-Products Coal Co.*, 35 S.W.2d 898, 900 (Ky. 1931); *see also Pittsburgh Nat'l Bank v. Allison Eng'g Co.*, 421 A.2d 281, 284 (Pa. Super. Ct. 1980)(stating, under Pennsylvania law, "[T]he treatment of a minimum royalty as a penalty or rent, not recoupable against tonnage royalties unless so provided in the lease, has become so well-established and so universally accepted that it has become a rule of law."); *Anderson v. United Coal & Coke Co.*, 227 P.2d 700, 707-08 (Wyo. 1951)("In such case, too, the minimum royalty provided in the lease, in the absence of an agreement to the contrary, is independent of the payment made in any previous month or months.").

Here, the lease does not grant the lessee a defined right of recoupment. To the contrary, the lease expressly characterizes the minimum royalty as "nonrecoupable." A "recoupment" is "the recovery or regaining of something[.]" Black's Law Dictionary (8th ed. 2004). If KP were permitted to credit production royalties against the $3,000.00 obligation, KP would "recover" or "regain" part of the minimum already paid, a result contrary to the parties' express agreement that the minimum royalty would be nonrecoupable.[8]

At deposition, Mr. Khorrami first seemed to agree that KP should receive no credit. He conceded no credit would be payable:

    Q:    And what is the term "nonrecoupable" mean to you?

---

[8]

Certainly, inserting a recoupment right might make sense. Barring recoupment also can be reasonable. Here, for instance, the first year's rent was for $4,431.00, *see* DE #18-3, and a nonrecoupable $3,000.00 amount may reflect an expectation of what the overall value to the Heirs, with expected production royalties, should be. As a matter of negotiation, the language chosen obviously reflects the parties' bargained result.

14

>   A:     That means that we cannot recover that money in terms of, *we cannot call it advanced royalties.*

*See* DE #26 Khorrami Dep. at 47 (emphasis added).  Quickly, however, Mr. Khorrami then asserted a right to "offset" actual production royalties.  *See id.*  Importantly, KP could cite no basis in the lease for the right to an offset:

>   Q:     And where is the language that says that?
>
>   A:     [T]hat's the argument over the case . . . I'm giving you my understanding . . . I'm not interpreting the language.

*See id.* at 47-48.  Mr. Khorrami summarized his argument: "And nobody has asked for it."  *See id.* at 48.[9]

In written discovery, KP admitted not paying the minimum royalty, but relied on waiver as a defense:

>   Defendant has not paid to the Lessors annual minimum nonrecoupable royalties because the Plaintiffs waived this requirement in writing and its performance of any such obligation was excused by Plaintiffs nonperformance or breach . . .

*See* DE #26-14 (Response to Request for Admission No. 1).  KP did not, in that context, suggest that production royalties reduce or offset the minimum royalty.  Rather, KP contended that it had not paid the minimum because the Heirs had waived or themselves had breached the lease.  The Court already rejected waiver, and KP evidently abandoned the alternative argument.

The Court finds, as a matter of law, that KP owed the $3,000.00 per annum without recoupment and that KP has failed to pay said amount for the entirety of its status as lessee.

---

[9] The Court agrees that, relative to the failure to raise the claim until now, the statute of limitations is the primary determinant given the lack of equitable factors.  Obviously, under Kentucky contract law, the claim going back to lease assignment is timely.  *See* KRS § 413.090.

## IV. Conclusion

The effect of the Court's ruling is that the lease is terminated prospectively "as to all but each producing well and 40 acres around it." *See* DE #18-3 ¶ 18. Further, the Heirs are entitled to a back payment of the minimum royalty since the assignment, and KP's lease right (and obligation) is limited to said producing wells with attendant acreage per the lease.[10]

The Heirs also request prejudgment interest "at the statutory rate of 8% per annum compounded annually." In a diversity action, state law controls whether to award interest. *See Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000); *Phelps v. Unum Provident Corp.*, 245 F.App'x 482, 487 (6th Cir. 2007). In Kentucky, "prejudgment interest follows as a matter of course" where "damages are liquidated." *See Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991); *see also Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 901 (6th Cir. 2007). According to *Nucor*, a fixed royalty payment would qualify as a "liquidated" sum. *See Nucor Corp.*, 812 S.W.2d at 141 (defining "liquidated" as "made certain or fixed by agreement" and citing as an example an "unpaid fixed contract price"). The Heirs therefore properly demand prejudgment interest. The Heirs also apply the proper interest rate. On a liquidated claim, "a successful plaintiff is *entitled* to interest" at 8% per annum – the legal rate provided in KRS § 360.010. *See Poundstone*, 485 F.3d at 903 (emphasis added)(quoting *Pursley v. Pursley*, 144 S.W.3d 820, 828 (Ky. 2004)).

A key issue is whether to award compound interest. According to the Kentucky Court of Appeals, "prejudgment interest has traditionally been simple interest," but it is not a legal requirement. *See Reliable Mechanical, Inc. v. Naylor Indus. Servs.*, 125 S.W.3d 856, 858 (Ky. Ct.

---

[10] Thus, the minimum royalty obligation is at an end. KP's production royalty obligation continues.

App. 2003).[11] Thus, the court of appeals allowed compound interest in *Naylor* where "fairness justifie[d] and indeed dictate[d]" the award, explaining:

> Reliable has deprived Naylor of the use of the money rightfully due and owed to it for nearly eight (8) years. Arguably, Naylor would have been capable of earning compound interest on its money during this lengthy time period. We note parenthetically that commercial lending and saving institutions no longer offer simple interest rates.
>
> An award of compound pre-judgment interest in this case does not constitute a punitive reprisal as to Reliable. Rather, it is an equitable means of recognizing the economic reality that Reliable has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from Naylor. The court's award of compounded pre-judgment interest reconciles and adjusts that inequitable result by providing to Naylor a sum that it might have earned had its money been tendered in a timely manner. Any other holding would diminish the real value of Naylor's recovery in this case.

*Id*.

The "economic realities" discussed in *Naylor* apply equally to the facts of this case. KP and the defendant in *Naylor* both failed to pay a substantial sum of money over a "lengthy time period." In fact, KP's unpaid royalties extend back over eleven years, whereas the debt in *Naylor* was not yet eight years overdue. Plainly, KP "has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from" Plaintiffs. Defendant feebly asserts that "fairness" does not warrant

---

[11] KRS § 360.010 – the statute applicable to *prejudgment* interest – actually is silent about compounding. In the *post-judgment* context, KRS § 360.040 specifically provides for compound interest. The Kentucky Court of Appeals, in *Naylor*, addressed the discrepancy, holding: "[W]e are not persuaded that the difference in the language of the statutes means that KRS 360.010 prohibits the compounding of prejudgment interest." *See Naylor*, 125 S.W.3d at 857-58.

compounding on this record, but fails meaningfully to distinguish *Naylor*. The Court therefore rejects KP's argument and awards compound interest.[12]

For the reasons stated, the correct remedy is $3,000 for every unpaid minimum royalty (between assignment and the May 2006[13] payment) plus 8% interest compounded annually from the date that each royalty payment was due until the date that the Court enters judgment.[14] Post-judgment interest also applies, as provided in 28 U.S.C. § 1961.

This the 2nd day of June, 2008.



Signed By:
Robert E. Wier
United States Magistrate Judge

G:\01 judge\07-113 KP.rw.wpd

---

[12] The Kentucky Supreme Court has not considered whether state law allows compound prejudgment interest. In applying state law, a federal court generally "must follow the decisions of the state's highest court," but if an "issue has not been directly addressed" the court "must anticipate how the relevant state's highest court would rule." *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 563 (6th Cir. 2008). An intermediate state appellate court decision is "viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *See id*. Here, KP acknowledges that this Court may in its "discretion" award compound interest based on *Naylor*.

[13] The 2006 termination notice, and KP's failure to cure, would result in cancellation prior to the May 2007 payment coming due. As such, the Court determines that the May 2006 minimum royalty was the last such obligation.

[14] Although not specifically contested by Defendant, the Court does not adopt the calculations from the table in Plaintiffs' brief. First, the calculations appear to double count the unpaid royalties. Second, the table purports to show compound interest, but the calculations appear to reflect only simple interest.